170 January 17, 2013 No. 4

IN THE SUPREME COURT OF THE
STATE OF OREGON

ASSOCIATION OF OREGON
CORRECTIONS EMPLOYEES,
*Petitioner on Review*,

*v.*

STATE OF OREGON
and Department of Corrections,
*Respondents on Review*.

(UP 3303; CA A143552; SC S059971)

On review from the Court of Appeals.*

Argued and submitted September 21, 2012.

Becky Gallagher, Fenrich & Gallger, P.C., Eugene, argued the cause and filed the brief for petitioner on review.

Leigh A. Salmon, Assistant Attorney General, Salem, argued the cause and filed the brief for respondents on review. With her on the brief were Mary H. Williams, Deputy Attorney General, and Anna M. Joyce, Solicitor General.

Todd A. Lyon, Barran Liebman LLP, Portland, filed the brief for *amicus curiae* Oregon Public Employer Labor Relations Association and The League of Oregon Cities.

Jason A. Weyand, Senior Legal Counsel, Oregon AFSCME, Salem, filed the brief for *amicus curiae* Oregon AFSCME. With him on the brief was Jennifer K. Chapman.

Before Balmer, Chief Justice, Kistler, Walters, Linder, and Landau, Justices, and Durham and De Muniz, Senior Judges, Justices pro tempore.**

---

\* On judicial review from the final order of the Employment Relations Board, dated July 23, 2009. 246 Or App 477, 268 P3d 627 (2011).

\*\* Brewer and Baldwin, JJ., did not participate in the consideration or decision of this case.

WALTERS, J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

**WALTERS, J.**

The Department of Corrections (DOC), a public employer, made changes to its employees' scheduled days off and their shift stop and start times without first bargaining with representatives of the employees' union, the Association of Oregon Corrections Employees (AOCE). As an affirmative defense to AOCE's ensuing complaint alleging that DOC had committed an unfair labor practice, DOC asserted that the terms of the parties' collective bargaining agreement (CBA) permitted its unilateral action. The Employment Labor Relations Board (ERB) rejected DOC's argument and concluded that DOC had committed an unfair labor practice under ORS 243.672(1)(e).[1] The Court of Appeals reversed. *Assn. of Oregon Corrections Emp. v. State of Oregon*, 246 Or App 477, 268 P3d 627 (2011) (*AOCE II*). We reverse the decision of the Court of Appeals and remand to that court to permit it to consider an assignment of error that it did not reach.

## I.   FACTS AND PROCEDURAL BACKGROUND

AOCE is the exclusive representative of a bargaining unit of correctional officers, sergeants, and corporals employed by DOC, a public employer, at the Oregon State Penitentiary. AOCE and DOC were parties to a collective bargaining agreement that was effective from July 1, 2001, through June 30, 2003. Shortly before May 27, 2003, AOCE learned that DOC intended to post a new work schedule. The new schedule changed, among other things, employees' scheduled days off and their shift start and stop times. At a bargaining meeting on May 27, 2003, AOCE informed DOC that, in its view, the intended changes affected mandatory subjects of bargaining and that DOC would be committing an unfair labor practice if it implemented them without bargaining with AOCE. On May 30, 2003, DOC posted the new schedule. On June 27, 2003, AOCE filed a complaint

---

[1] ORS 243.672(1)(e) provides, in part:

"(1) It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"* * * * *

"(e) Refuse to bargain collectively in good faith with the exclusive [bargaining] representative [of its employees]."

with ERB alleging, among other things, that DOC had committed an unfair labor practice under ORS 243.672(1)(e), the provision of the Public Employees Collective Bargaining Act (PECBA) that prohibits a public employer from refusing to bargain collectively in good faith with the bargaining representative of its employees.[2]

DOC denied AOCE's allegations and raised a number of affirmative defenses, one of which alleged that "the Collective Bargaining Agreement allows management to set the work schedule(s)." For that contractual defense, DOC relied on Article 3 of the CBA, which included a management rights clause providing that DOC "retains all inherent rights of management" and "retains all rights to direct the work of its employees, including but not limited to, the right * * * to schedule work * * * except as modified or circumscribed by the terms of this Agreement." DOC also alleged as a separate affirmative defense that AOCE had waived its right to bargain by failing to file a timely demand, as required by ORS 243.698(3).

ERB first determined that "scheduling the particular hours of the day and days of the week that an employee is assigned to work constitutes 'hours of work', a *per se* mandatory subject of bargaining under ORS 243.650(7)(a)." *Ass'n of Oregon Corr. Employees v. State of Oregon, Dep't of Corr.,* 20 PECBR 890 (2005). ERB then concluded that DOC had made a unilateral change with respect to those matters and, thus, had committed an unfair labor practice.[3] *Id.* at 899. In doing so, ERB rejected DOC's contractual defense,

---

[2] In its complaint, AOCE alleged that DOC had committed an unfair labor practice under ORS 243.672(1)(e) not only by unilaterally altering employee days off and start-stop times for shifts, but also by unilaterally altering the incumbency provision of the CBA and the rank that employees must hold to bid on certain assignments.

[3] ERB rejected AOCE's other allegations that DOC had violated ORS 243.672(1)(e). ERB determined that AOCE was required to raise its claim concerning the incumbency provision as a grievance or through an unfair labor complaint under ORS 243.672(1)(g), which provides that it is an unfair labor practice for a party to violate the provisions of any written contract with respect to employment relations. ERB determined that DOC was not required to bargain over the changes that it made to employee ranking because those changes concerned the assignment of duties and minimum qualifications, both of which are permissive subjects for bargaining. ORS 243.650(7)(g). AOCE did not challenge those aspects ERB's decision in the Court of Appeals.

determining that DOC had not demonstrated that AOCE contractually had waived its statutory right to bargain over the contested changes.[4] *Id.* at 899-900.

DOC appealed to the Court of Appeals. Its primary argument on appeal was that ERB had erred in its analysis of DOC's contractual defense. ERB had erred, DOC contended, in evaluating the CBA to determine whether DOC had demonstrated a waiver of the statutory right to bargain. Instead, DOC argued, ERB legally was required to decide, as an initial matter, whether the CBA authorized DOC to make the changes at issue. The court agreed with DOC and did not reach DOC's other arguments: that Article 3 constituted a waiver of AOCE's right to bargain even under ERB's waiver analysis, and that AOCE had waived its right to bargain by failing to file a timely demand to bargain under ORS 243.698(3). The Court of Appeals reversed and remanded the case to ERB, instructing ERB to determine in the first instance "whether, under the terms of the CBA, DOC was authorized to make the changes * * * that it did." *Association of Oregon Corrections Employees v. DOC*, 209 Or App 761, 770, 149 P3d 319 (2006) (*AOCE I*).

On remand, ERB determined that the terms of the CBA were ambiguous and, after considering extrinsic evidence, concluded that the parties had not authorized DOC to make the contested changes. *Ass'n of Oregon Corr. Employees v. State of Oregon, Dep't of Corr.*, 23 PECBR 222 (2009). The Court of Appeals again reversed. *AOCE II,* 246 Or at 479. The court determined that the terms of the CBA unambiguously granted DOC the right to make the contested changes and that ERB had erred in concluding that DOC had committed an unfair labor practice under ORS 243.672(1)(e). *Id*. AOCE sought review in this court, which we allowed.

---

[4] As to DOC's defense that AOCE had waived its right to bargain by failing to file a timely demand to bargain, ERB held that PECBA does not require a formal demand to bargain under these circumstances. According to ERB, AOCE's statements, in which it contested DOC's scheduling changes and argued that those changes would constitute an unfair labor practice, were sufficient. Moreover, ERB concluded, even if AOCE's statements were insufficient to constitute a demand under ORS 243.698(3), DOC's unilateral implementation of the schedule three days after AOCE had objected "essentially presented AOCE with a *fait accompli*." There is no requirement that a union demand to bargain, ERB explained, when the employer already has made the unilateral change. *Id*. at 900-01.

Before we begin our discussion of the issues for our consideration, we note that DOC does not dispute that (1) employees' days off and shift stop and start times are mandatory subjects of bargaining; (2) DOC had a statutory obligation and AOCE had a statutory right to bargain over those matters; and (3) DOC made changes to those matters without first bargaining with AOCE. Thus, whether ERB was correct in concluding that DOC committed an unfair labor practice under ORS 243.672(1)(e) depends on whether ERB was correct in deciding that DOC had not established a sufficient affirmative defense to the charge that it made a change in a mandatory subject of bargaining without first bargaining with AOCE.

The first issue that we must reach in deciding that question is the correct legal framework by which to measure DOC's affirmative defense. In its 2005 decision, ERB had used a waiver analysis—an analysis that the Court of Appeals rejected in *AOCE I*. AOCE did not petition for review in *AOCE I*. Therefore, ERB used the method of analysis that the Court of Appeals required in *AOCE I* when it considered DOC's affirmative defense on remand in 2009 and again concluded that DOC had committed an unfair labor practice under ORS 243.672(1)(e). The question before us on review of the Court of Appeals decision in *AOCE II* is whether ERB was correct in its conclusion. Because whether DOC committed an unfair labor practice depends on the merits of its affirmative defense, we must decide, as an initial matter, the appropriate legal framework by which to evaluate that defense, and we must do so despite the fact that that matter was directly at issue in *AOCE I* and is only indirectly at issue here. The correct legal measure of DOC's affirmative defense is so inextricably intertwined with its merits that we consider the following questions in turn: First, did ERB err in deciding that, to prevail on its contractual defense, DOC was required to demonstrate that the terms of the CBA established a clear and unmistakable waiver of AOCE's statutory right to bargain? Second, did ERB err in concluding that the terms of the CBA did not meet the correct legal standard?[5]

---

[5] Because the first of those questions was directly presented only in *AOCE I*, we asked the parties for supplemental briefing on that issue. We have received and considered that briefing.

## II.   ERB'S WAIVER ANALYSIS

We begin our inquiry into whether ERB erred in its waiver analysis of DOC's contractual defense with the applicable unfair labor practice statute—ORS 243.672(1)(e)— which provides, in part:

"(1)   It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"* * * * *

"(e)   Refuse to bargain collectively in good faith with the exclusive [bargaining] representative [of its employees]."

"Collective bargaining" is defined in ORS 243.650(4) as

"the performance of the mutual obligation of a public employer and the representative of its employees to meet at reasonable times and confer in good faith with respect to *employment relations* for the purpose of negotiations concerning mandatory subjects of bargaining, to meet and confer in good faith in accordance with law with respect to any dispute concerning the interpretation or application of a collective bargaining agreement, and to execute written contracts incorporating agreements that have been reached on behalf of the public employer and the employees in the bargaining unit covered by such negotiations."

(Emphasis added.)

"Employment relations"—about which a public employer must bargain in good faith—is defined in ORS 243.650(7)(a) to include

"matters concerning direct or indirect monetary benefits, *hours*, vacations, sick leave, grievance procedures and other conditions of employment."

(Emphasis added.) "Employment relations" is further defined in ORS 243.650(7)(g) to exclude "scheduling of services provided to the public[.]"

Thus, a public employer commits an unfair labor practice under ORS 243.672(1)(e) if it refuses to bargain with respect to matters that are included within, and not excluded by, the definition of "employment relations." Those matters are referred to as "mandatory" subjects of bargaining. *See Tualatin Valley Bargaining v. Tigard School Dist.*, 314 Or 274, 277, 840 P2d 657 (1992) (so explaining).

As DOC acknowledges, a public employer commits a *per se* violation of ORS 243.672(1)(e) if it makes a unilateral change regarding a mandatory subject of bargaining while the employer has a duty to bargain.[6] *See Wasco County v. AFSCME*, 46 Or App 859, 613 P2d 1067 (1980) (upholding ERB's authority to adopt "violation *per se*" analysis of unilateral changes). When reviewing an allegation of unlawful unilateral change, ERB considers (1) whether an employer made a change to an "established practice," often referred to as the "status quo";[7] (2) whether the change concerned a mandatory subject of bargaining; and (3) whether the employer exhausted its duty to bargain. *Ass'n of Oregon Corr. Employees*, 20 PECBR 890, 897. When asserted, ERB also considers an employer's affirmative defense of waiver:

> "A party may waive its right to bargain through (1) 'clear and unmistakable' contract language, (2) a bargaining history that shows the party consciously yielded its right to bargain, or (3) by the party's action or inaction."

*Id.*

At issue in this case is ERB's use of the waiver standard to evaluate DOC's contractual defense. DOC does not contend that ERB's recognition of an affirmative defense of waiver is beyond its statutory authority or conflicts with ORS 243.672(1)(e) or any other provision of PECBA. Instead, DOC argues that ERB erred in confining its analysis of DOC's contractual defense to a consideration of whether the parties' collective bargaining agreement demonstrated a clear and unmistakable waiver of AOCE's

---

[6]  ERB's *per se* rule is modeled after an analogous rule adopted by the National Labor Relations Board to enforce the duty to "bargain collectively" under section 8(a)(5) of the National Labor Relations Act (NLRA). The Supreme Court explained the rationale for that rule in *Labor Board v. Katz*, 369 US 736, 747, 82 S Ct 1107, 8 L Ed 2d 230 (1962) (holding that an employer violates section 8(a)(5) of the NLRA if it makes a unilateral change to employment conditions without bargaining over the relevant term).

[7]  ERB has explained that cases dealing with allegations of unilateral change that occur during the term of a CBA generally refer to the prohibited activity as a change in employer "past practice," while cases dealing with allegations of unilateral change during the course of post-contract negotiations (the "hiatus period") refer to changes in the "status quo." ERB has noted, however, that there is "little difference analytically between these two." *Coos Bay Police Officers' Ass'n v. City of Coos Bay*, 14 PECBR 229, 232-33 (1993).

statutory right to bargain. DOC argues that ERB also was required to consider whether the CBA authorized DOC to take the unilateral action that it did. That requirement is imposed, DOC contends, both by this court's decision in *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 808 P2d 83 (1991), which instructs ERB to consider the terms of a collective bargaining agreement according to ordinary rules of contract interpretation, and by PECBA. ERB's analysis is at odds with PECBA, DOC contends, because it "undermines the sanctity of the written contract; * * * injects uncertainty and instability into the labor-management relationship; and * * * effectively ignores the preliminary step in any unilateral change claim—namely, whether there has, in fact, been a *change* in the status quo." (Emphasis in original.)

Before we consider DOC's arguments, it is helpful to trace the origins of ERB's waiver analysis. ERB initially applied the waiver analysis in considering an employer's contract defense to an unfair labor practice charge in *Corvallis School Dist. 509J v. Oregon School Employees Ass'n, Chapter No. 2*, 6 PECBR 5409 (1982). ERB took guidance from cases decided by the National Labor Relations Board (NLRB) under the National Labor Relations Act (NLRA), the federal act on which PECBA was modeled. *Elvin v. OPEU*, 313 Or 165, 177, 832 P2d 36 (1982). ERB held that, under those cases, it was "settled law that any waiver of the statutory right to bargain over a mandatory subject of bargaining must be in clear and unmistakable language." *Corvallis School Dist. 509J* at 5412 (citing *N L Industries v. NLRB*, 92 LRRM 2937, 2938 (1976)).

The NLRB first applied a waiver analysis in considering an employer's contractual defense to an unfair labor practice charge in Tidewater Associated Oil Company, 85 NLRB 1096, 1098 (1949). In that case, a union charged that an employer had made a unilateral change to its employees' pension plan without first bargaining with the union. In its defense, the employer relied on a "Management Functions" clause in the parties' collective bargaining agreement. The NLRB rejected the employer's defense, upholding the Trial Examiner's finding that the broad "Management Functions" clause "was at least ambiguous." "Our agreement with the

Trial Examiner," the NLRB wrote, "is based primarily upon the absence of a specific waiver of the Union's right to bargain * * *. We are reluctant to deprive employees of any rights guaranteed them by the [NRLA] in the absence of a clear and unmistakable showing of a waiver of such rights." Id. at 1098.

The United States Supreme Court affirmed the NLRB's application of waiver as a defense to an unfair labor practice charge in *Metropolitan Edison Co. v. NLRB*, 460 US 693, 103 S Ct 1467, 75 L Ed 2d 387 (1983). In that case, a union had charged that an employer had committed an unfair labor practice by treating union officials more harshly than other union members in the aftermath of a strike, thus discouraging union membership in violation of 29 USC §158(a)(3).[8] The Court considered whether a general no-strike provision, such as the one in the parties' collective bargaining agreement, was sufficient to waive the specific right to strike over an unfair labor practice. *Id.* at 708. The Court began by stating that it "long has recognized that a union may waive a member's statutorily protected rights[.]" Waivers are valid, the Court explained, because they rest on the premise of fair representation and presuppose that the selection of the bargaining representative remains free. *Id.* at 705. However, the court cautioned:

> "[W]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.' More succinctly, the waiver must be clear and unmistakable."

*Id.* at 708.[9]

---

[8] 29 USC § 158(a)(3) provides, in part:

   "(a) * * * It shall be an unfair labor practice for an employer

   "* * * * *

   "(3) by discrimination in regard to * * * any term or condition of employment to encourage or discourage membership in any labor organization * * *."

[9] In *Metropolitan Edison,* the Court relied on *Mastro Plastics Corp. v. Labor Board*, 350 US 270, 76 S Ct 349, 100 L Ed 309 (1956), in which it had addressed the question whether a general no-strike provision waived the specific right to strike over an unfair labor practice. The Court in *Mastro Plastics* determined that, although a waiver could be valid if it were "explicitly stated," the terms of the collective bargaining agreement at issue were not clear enough: a "more compelling expression" of the waiver was required. *Id.* at 283.

The NLRB continues to use the same waiver analysis that it articulated in *Tidewater*. *See Provena St. Joseph Medical Center*, 350 NLRB 808, 815 (2007) (when an employer in a unilateral change case asserts that the contract authorizes it to act unilaterally, the employer must prove its defense by clear and unmistakable contract language). *See also* John E. Higgins ed., 1 *The Developing Labor Law* 1068 (6th ed 2012) ("Consistent with the traditional common law view of waiver, the [NLRB] [has] * * * confined the waiver doctrine narrowly and [has] been reluctant to infer a waiver.").[10]

In *Oregon School Employees Ass'n v. Bandon School Dist. #54*, 19 PECBR 609 (2002), ERB decided to adhere to the waiver analysis that it had articulated in *Corvallis*. That analysis, ERB explained, was "historically recognized by [ERB] and the private sector," is "well-established," and "there is a large body of case law available for guidance in deciding such cases." *Id*. at 623-24. Considering the purposes of PECBA, ERB determined that a waiver analysis was most appropriate because it "keeps the focus where it should be: on the general rule that there is a continuing duty to bargain during the contract term over mandatory subjects

---

[10] Although the Supreme Court has not yet applied the waiver analysis followed in *Metropolitan Edison* to a charge that an employer committed an unfair labor practice by refusing to bargain, the Ninth Circuit Court of Appeals has done so. *See Local Joint Exec. Bd. Of Las Vegas v. N.L.R.B.*, 540 F3d 1072, 1075 (9th Cir 2008) (applying *Metropolitan Edison* to hold that "[w]here a unilateral change is defended on a claim of contractual right, the alleged waiver must be * * * clear and unmistakable"). Decisions from the Second, Third, Fourth, Seventh, and Eighth Circuits similarly have applied the waiver standard in cases where employers invoked contract provisions as authority for making unilateral changes in terms and conditions of employment. *See*, *e.g.*, *Bonnell/Tredegar Industries, Inc. v. N.L.R.B.*, 46 F3d 339, 346 n 6 (4th Cir 1995); *Olivetti Office U.S.A., Inc. v. N.L.R.B.*, 926 F2d 181, 187 (2d Cir 1991), *cert den*, 502 US 856 (1991); *Ciba-Geigy Pharmaceuticals Div. v. N.L.R.B.*, 722 F2d 1120, 1127 (3d Cir 1983); *American Oil Co. v. N.L.R.B.*, 602 F2d 184, 188-89 (8th Cir 1979); *Murphy Diesel Company. v. N.L.R.B.*, 454 F2d 303, 307 (7th Cir 1971).

Not all courts agree. *See, e.g.*, *Bath Marine Draftsmen's Ass'n v. N.L.R.B.*, 475 F3d 14, 25 (1st Cir 2007) (adopting the District of Columbia Circuit's "contract coverage" test); *Enloe Medical Center v. N.L.R.B.*, 433 F3d 834, 838 (DC Cir 2005) (rejecting the NLRB's use of the waiver standard in the context of a unilateral change case); *Chicago Tribune Co. v. N.L.R.B.*, 974 F2d 933, 936-37 (7th Cir 1992) (adopting the District of Columbia Circuit's "contract coverage" test).

*unless* there is showing of waiver."[11] *Id*. at 624 (emphasis in original).

As noted, DOC does not contend that ERB's waiver defense exceeds its statutory authority or constitutes legal error; instead, it contends that, under PECBA and this court's decision in *Rainier School Dist. No. 13*, 311 Or 188, ERB cannot reach the issue of waiver until it first decides whether a collective bargaining agreement permits an employer's unilateral action. For the reasons that follow, we conclude that ERB's analysis was not legally erroneous and that neither PECBA nor any other source of law compelled ERB to adopt the analysis for which DOC advocates.

We return first to the text of ORS 243.672(1)(e), set out *infra*, 353 Or at 176, and observe that it does not specifically delineate or address defenses to a charge that an employer has committed an unfair labor practice by refusing to bargain with respect to a mandatory subject of bargaining. We then look to the enactment history of that statute and case law interpreting it and learn that the Oregon legislature enacted PECBA in 1973 to model the NLRA. *Elvin*, 313 Or at 175 n 7. Therefore, cases decided under the NLRA, including those outlining affirmative defenses to unfair labor practice charges, provide guidance in interpreting PECBA. *Id.* at 177-78. Importantly for this case, the NLRB's use of a waiver rubric to analyze contract defenses to unfair labor practice charges was well-established by 1973. Thus, we infer that the Oregon legislature intended that defenses to unfair labor practice charges under ORS 243.672(1)(e) be analyzed under that same rubric. *See State Treasurer v.*

---

[11] Prior to *Oregon School Employees Ass'n v. Bandon School Dist. #54*, 19 PECBR 609 (2002)*,* ERB had permitted employers to defend unfair labor practice claims by demonstrating that the union had agreed to contract terms that were "specifically relevant to the issue in dispute." *See, Oregon School Employees Ass'n v. Astoria School District 1*, 13 PECBR 474, 480 (1992). However, ERB also had continued to analyze contract terms asserted as an affirmative defense under its waiver analysis. *See Fed'n of Oregon Parole and Probation Officers v. Washington County*, 19 PECBR 441, 428 (2001) (holding that a general management rights clause did not constitute a waiver). In *Bandon*, ERB determined that it would no longer permit the "specifically relevant" defense. *Id.* at 609. The Court of Appeals affirmed that shift, recognizing that ERB's formulation of what constitutes an adequate defense may change over time. *Lincoln Cty Ed. Assn. v. Lincoln Cty Sch. Dist.*, 187 Or App 92, 98, 67 P3d 951 (2003). In this case, DOC does not challenge ERB's authority to make that shift, nor does it argue that the law requires ERB to permit a "specifically relevant" defense.

*Marsh & McLennan Companies Inc.,* 353 Or 1, 20, ___ P3d ___ (2012) (applying that principle of statutory interpretation).

DOC's argument that ERB's waiver analysis conflicts with the purposes of PECBA is not convincing. ERB's analysis does not undermine the sanctity of the written labor contract or inject uncertainty or instability into the labor-management relationship. If an employer and a union agree by written contract terms that, going forward, the employer will have the right to make unilateral changes to employees' terms and conditions of employment, then those contract terms will establish a waiver of the union's statutory right to bargain over those issues and will be enforced. The parties can avoid uncertainty and instability by making the employer's right to take that future unilateral action clear and unmistakable. The parties also may use ORS 243.672 to address alleged contract violations. ORS 243.672 makes it an unfair labor practice for a public employer or public employee to "[v]iolate the provisions of any written contract with respect to employment relations." ORS 243.672(1)(g); ORS 243.672(2)(d). If a collective bargaining agreement requires or permits certain action, a party that alleges a failure to comply with such a provision may file an unfair labor practice complaint alleging a contractual violation under that statute. ERB's waiver analysis does not conflict with the terms of PECBA or thwart the legislature's intent or purpose.

We also are not persuaded that ERB's waiver analysis is legally erroneous because it is contrary to this court's decision in *Rainier School Dist. No. 13*, 311 Or 188. It is true that in that case, the court held that "[a] collective bargaining agreement is one type of contract" and that "[i]n discharging its statutory responsibility, ERB is required to interpret collective bargaining agreements * * * in the same manner and pursuant to the same rules of construction as do courts." *Id.* at 194. However, the court's holding in *Rainier School Dist. No. 13* arose not in the context of ORS 243.672(1)(e), the statutory provision at issue in this case, but in the context of ORS 243.672(1)(g), which makes it an unfair labor practice for a public employer to "[v]iolate the

provisions of any written contract with respect to employment relations."[12] In a charge under ORS 243.672(1)(g), the inquiry is whether an employer has done what the collective bargaining contract required it to do. In a defense to a charge under ORS 243.672(1)(e), the inquiry is whether the union, by agreeing to certain contract terms, has relinquished its statutory right to bargain. Both inquiries require the interpretation of the collective bargaining agreement, but because the purpose of the inquiry is different, the rules of construction also may differ.

The fact that a collective bargaining agreement is a contract and must be construed as such does not preclude ERB from requiring that contract terms offered to establish an affirmative defense to a charge under ORS 243.672(1)(e) be evaluated under a waiver rubric. Absent a sufficient affirmative defense, a union has a statutory right to insist that an employer bargain over mandatory subjects before making changes to the status quo. The general rule in Oregon is that, although waivers of constitutional and statutory rights may be expressed through contract terms, those terms must clearly indicate an "'intention to renounce a known privilege or power.'" *Johnson v. Swaim*, 343 Or 423, 431, 172 P3d 645 (2007) (quoting *Great American Ins. v. General Ins.,* 257 Or 62, 72, 475 P2d 415 (1970)). Under Oregon law, a waiver is "'the intentional relinquishment of a known right.'" *Id*. at 431 (quoting *Waterway Terminals v. P. S. Lord*, 242 Or 1, 26, 406 P2d 556 (1965)). "To make out a case of waiver of a legal right there must be a clear, unequivocal, and decisive act of the party showing such a purpose * * *." *Waterway Terminals*, 242 Or at 27. *See also Taylor v. U.S. National Bank*, 248 Or 538, 544, 436 P2d 256 (1968) (stating that contract language construed to relinquish a widow's statutory right to homestead and exempt property must evince a "clear and explicit" waiver of those rights).

---

[12] In its 2005 decision in this proceeding, ERB distinguished between AOCE's claims that alleged that DOC had failed to bargain in good faith under ORS 243.672(1)(e) and those that alleged that DOC had breached its contract with AOCE in violation of ORS 243.672(1)(g). A breach of the CBA alone, the ERB explained, does not constitute bad faith bargaining; rather, such claims must be raised as grievances under the CBA or through an unfair labor practice complaint under ORS 243.672(1)(g). *Ass'n of Oregon Corr. Employees*, 20 PECBR 890 (2005).

This court's statement in *Rainier School Dist. No. 13* does not preclude ERB's waiver analysis, nor does it compel the analysis for which DOC advocates. As the United States Supreme Court explained in *Mastro Plastics Corp. v. Labor Board*, 350 US 270, 279, 76 S Ct 349, 100 L Ed 309 (1956), collective bargaining agreements are like other contracts in that they "must be read as a whole and in the light of the law relating to it when made," but, when the terms of a collective bargaining agreement are raised to contest a union's statutory right, the contract terms must demonstrate that the union waived that right.

Finally, ERB's analysis does not ignore, but in fact requires, consideration of the preliminary step in any unilateral change claim—whether there has been a change in the status quo. As noted, the first step in ERB's unfair labor practice inquiry is whether the employer made a change to an "established practice." To make that determination, ERB considers "[w]hether the parties have, by their words or actions, defined their rights and responsibilities with regard to a given employment condition." *Coos Bay Police Officers' Ass'n v. City of Coos Bay*, 14 PECBR 229, 233 (1993). ERB looks to a variety of sources, including not only the terms of a current or an expired collective bargaining agreement, but work rules, policies, and an employer's "pattern of behavior." *Id*. Thus, ERB *does* consider the terms of the parties' collective bargaining agreement, among other factors, in its analysis of whether the employer has made a change to the status quo.

DOC has not convinced us that PECBA or any other provision of Oregon law required ERB to adopt a different analysis in its consideration of whether an employer has made a unilateral change in violation of ORS 243.672(1)(e). When an employer relies on contract terms as an affirmative defense against a charge that it changed the status quo without first bargaining with the union, ERB may consider those terms in evaluating whether they demonstrate that the union waived the right to bargain about such changes. The law does not demand that ERB first consider those contract terms to determine, under the status quo rubric, whether they authorized the employer's action. Such a

requirement would effectively displace the waiver analysis as a contract-based affirmative defense to a charge under ORS 243.672(1)(e), and we can discern no legal basis for imposing it.

In summary, the Court of Appeals was incorrect when it decided in *AOCE I* that ERB had erred in its use of the waiver analysis to evaluate the merits of DOC's contractual affirmative defense. ERB's waiver analysis recognizes that the duty to bargain under ORS 243.672(1)(e) continues after the parties have entered into a collective bargaining agreement and that a union retains its right to bargain on mandatory subjects of bargaining unless it waives that right.

### III.   APPLICATION OF WAIVER ANALYSIS

Because the Court of Appeals determined in *AOCE I* that ERB had erred in its waiver analysis, the court did not reach DOC's alternative argument that, even if ERB were correct in its use of that analysis, ERB erred in concluding that the contract terms on which DOC relied did not establish a clear and unmistakable waiver of AOCE's statutory right to bargain about changes to employees' scheduled days off and their shift stop and start times. We address that argument now. For the following reasons, we hold that ERB did not err in its interpretation of the parties' collective bargaining agreement.

As noted, DOC invokes Article 3 of the CBA, which provides:

"The Association agrees that the Employer retains all inherent rights of management and hereby recognizes the *sole and exclusive right of the State of Oregon*, as the Employer, *to operate and manage its affairs in accordance with its responsibilities* to maintain efficient governmental operations. The Employer retains all rights *to direct the work of its employees*, including, but not limited to, the right to hire, promote, assign, transfer, demote, suspend, or discharge employees for proper cause; *to schedule work*; determine the processes for accomplishing work; to relieve employees from duties because of lack of work or for other legitimate reasons; to take action as necessary to carry out the missions of the State; or determine the methods,

> means, and personnel by which operations are to be carried on, except as modified or circumscribed by the terms of this Agreement. The retention of these rights does not preclude any employee from filing a grievance, pursuant to Article 44, Grievance and Arbitration Procedure, or seeking a review of the exercise of these rights, when it is alleged such exercise violates provisions of this agreement."

(Emphasis added.)

In its 2005 decision, which was at issue in *AOCE I*, ERB recognized that the legislature had distinguished between scheduling services to the public and scheduling employee work hours. *Ass'n of Oregon Corr. Employees*, 20 PECBR at 897-98. The latter was a mandatory subject of bargaining, the former was not.[13] ERB explained that, in Article 3, the parties could have been referring to either subject:

> "It is unclear * * * whether the language applies to scheduling services to the public, or instead to individual employee work hours. The language might also apply to the employer's decision about when during the day to schedule a particular task, rather than to the hours a particular employee works."

*Id.* at 900. "One point is clear," ERB concluded: "[T]he provision does not expressly give DOC the right to unilaterally change the start/stop times and days off of employees. Such ambiguity and lack of specificity preclude us from finding a 'clear and unmistakable' waiver of bargaining over these subjects." *Id*.

When ERB reconsidered its decision in 2009 after remand by the Court of Appeals in *AOCE I*, ERB described the phrase "inherent rights of management" in Article 3 as one that is "commonly used in labor law" and stated that it had "repeatedly used the phrase to refer to subjects that are permissive for bargaining." *Ass'n of Oregon Corr. Employees,* 23 PECBR at 237. ERB concluded that the phrase

> "is a term of art in labor-management relations, and the parties used the phrase as it is commonly understood in

---

[13] Under ORS 243.650(7)(a), "employment relations" about which a public employer must bargain in good faith, includes "matters concerning * * * hours[.]" Under ORS 243.650(7)(g), "employment relations" does not include "scheduling of services provided to the public."

the labor-management community. Use of the phrase indicates that the parties intended the management rights clause to apply only to permissive subjects for bargaining. If so, the clause would not apply to work hours issues such as employee start-stop times and days off because they concern mandatory subjects for bargaining."

*Id.* at 238. That interpretation was bolstered, ERB noted, by the use of the word "retain" in Article. A party cannot retain, ERB reasoned, something that it never had in the first place. Thus, one plausible reading of Article 3 was that it authorized DOC to keep only those rights that it had prior to negotiating that provision (*i.e.*, the right to schedule services to the public); it did not grant DOC rights that it did not have (*i.e.*, the right to schedule employee work hours unilaterally). Prior to negotiating Article 3, DOC did not have the right unilaterally to change employee work hours, a mandatory subject for bargaining, and, ERB concluded, Article 3 did not unambiguously bestow that right.

In *AOCE I*, DOC argued to the Court of Appeals that the CBA granted DOC the broad right to "schedule work" and that, in the exercise of that right, DOC necessarily had to determine when such work would start and stop and on what days the work would occur. The fact that DOC's right to schedule might also encompass the scheduling of tasks did not mean that the provision was "ambiguous"; rather, DOC argued, it was merely an indication that DOC's scheduling powers were broad.

DOC renews its argument in this court. Citing *UFORMA/Shelby Business Forms, Inc. v. N.L.R.B.*, 111 F3d 1284, 1290 (6th Cir 1997), DOC contends that a broadly worded management rights clause operates as a clear and unmistakable waiver of a union's right to bargain with respect to subjects covered by that clause. We are not convinced. As ERB explained, there is a question in this case about the subject matter that is covered by Article 3. In theory, Article 3 could cover scheduling employee work hours. However, given ERB's prior interpretation of the term of art included in that Article and the parties' use of the word "retain," ERB did not err in concluding that the meaning of the term "to schedule work" in Article 3 also could be limited to directing

the work of employees and scheduling the services that they provide to the public. Consequently, ERB also did not err in concluding that Article 3 did not clearly and unmistakably waive its statutory right to bargain over changes to employees' scheduled days off and their shift stop and start times.[14]

## IV.   FAILURE TO FILE DEMAND TO BARGAIN

DOC also asks that we address an additional argument—that AOCE waived its right to bargain about the changes that DOC made by failing to file a demand to bargain within 14 days as required by ORS 243.698(3). The Court of Appeals did not reach that argument in *AOCE I* or *AOCE II*, and, because it involves arguments that differ significantly from those we address here, we remand to permit the Court of Appeals to consider those issues in the first instance.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

---

[14] ERB's ruling is consistent with its own prior case law. *See Fed'n of Oregon Parole and Probation Officers v. Washington County*, 19 PEBCR 411 (2001) (general language typically found in management rights clauses does not constitute a waiver); *Days Creek Ass'n of Classified Employees v. Days Creek School Dist. 15*, 16 PECBR 187, 202 (1995) (same); *Service Employees Int'l Union, Local #49 v. Pacific Communities Hospital*, 13 PECBR 753, 767 (1992) ("This Board does not often find a waiver of future bargaining rights in contract language. * * * Management rights * * * clauses * * * typically find their way into contracts with little discussion of the parties' intent. Moreover, most are worded so broadly that it cannot be concluded that a union 'clearly and unmistakably' waived a bargaining right which might never mature, and which concerns a subject not demonstrably in the contemplation of either party at the time of the purported waiver.").